**MCDERMOTT WILL & SCHULTE LLP**
Marcus A. Helt (TX 24052187)
Charles R. Gibbs (TX 7846300)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:    (214) 295-8000
Facsimile:    (972) 232-3098
Email:        mhelt@mwe.com
              crgibbs@mwe.com

**MCDERMOTT WILL & SCHULTE LLP**
Julia M. Beskin (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
Telephone:    (212) 756-2000
Facsimile:    (212) 593-5955
Email:        julia.beskin@srz.com

-and-

Steven Z. Szanzer (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone:    (212) 547-5400
Facsimile:    (212) 547-5444
Email:        sszanzer@mwe.com

*Counsel to Prime Asset LLC, Plaintiff*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PRIMALEND CAPITAL PARTNERS, LP, *et al.*,[1] | Case No. 25-90013 (MXM) |
| Debtors. | (Jointly Administered) |
| PRIME ASSET, LLC | Adv. Pro. No. 26-[    ] (  ) |
| Plaintiff, | |
| v. | |
| PRIMALEND CAPITAL PARTNERS, LP, GOOD FLOOR LOANS LLC, LNCMJ MANAGEMENT, LLC, PCAP HOLDINGS, LP, AND MARK JENSEN, | |
| Defendants. | |

---

[1]   The debtors and debtors-in-possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: PrimaLend Capital Partners, LP (0313), Good Floor Loans LLC (8219), LNCMJ Management, LLC (1374), and PCAP Holdings, LP (8774). The location of the Debtors' headquarters is 3460 Lotus Drive, Suite 100, Plano, TX 75075.

1

## ADVERSARY COMPLAINT

Plaintiff, Prime Asset LLC ("**Prime Asset**"), by way of this adversary complaint against (i) PrimaLend Capital Partners, LP ("**PCP**"), Good Floor Loans LLC ("**GFL**"), LNCMJ Management, LLC ("**LNCMJ**"), and PCAP Holdings, LP ("**PCAP**" and, together with PCP, GFL, and LNCMJ, "**PrimaLend**") and (ii) Mark Jensen ("**Jensen**" and, together with PrimaLend, the "**Defendants**"), hereby states as follows:

## PRELIMINARY STATEMENT

1. This adversary complaint arises from the Defendants' systematic and unlawful actions to infiltrate and dominate Prime Asset's operations, leveraging this control to induce Prime Asset into entering transactions that burdened Prime Asset with excessive debt and underperforming loan portfolios—all in service of the Defendants' broader scheme to fraudulently inflate their own financial profitability by foisting underperforming loans on Prime Asset (and others). The Defendants have engaged in a pervasive pattern obfuscating the consequences of their dubious lending practices by transferring distressed assets into car dealership after dealership, with the intention of pushing off the realization of PrimaLend's own losses. Ultimately, this scheme collapsed, resulting in the underlying Chapter 11 Cases (as defined below).

2. Prime Asset operates a factoring business in the buy-here-pay-here ("BHPH") auto loan industry. Put simply, Prime Asset buys retail installment sales contracts ("RISCs")  from car dealerships that entered into such contracts with their customers and, in exchange, Prime Asset provides the dealerships with financing. Since at least 2022, however, Prime Asset's business has been repeatedly impaired by the Defendants' exercising their control over Prime Asset to coerce Prime Asset into purchasing distressed notes from failed dealerships, including from PrimaLend's clients Auto Finance Center Holdings ("**AFCH**"), Your Car Store ("**YCS**"), and Automotive Services Finance ("**ASF**"). For example, in September 2022, PrimaLend brokered the transfer of near-valueless notes from PrimaLend's client AFCH to Prime

Asset; these transfers were either constructively or actually fraudulent and had severe repercussions on Prime Asset's financial stability and health. Jensen, as CEO of PrimaLend, then orchestrated unauthorized transfers of nearly $38,000,000 in loans from Prime Asset to Auto One Acceptance ("**AOA**"), and directed the sale of approximately $4,100,000 in YCS receivables to AOA. On June 28, 2024, these receivables were then putatively resold back into Prime Asset without any formal or informal authorization by Prime Asset.

3. Upon information and belief, PrimaLend and Jensen repeatedly engaged in unregistered "broker" activity under the Securities Exchange Act of 1934 and the Texas Securities Act by taking so-called "advisory fees" for matching sellers of loans with buyers, including in 2018 when Prime Asset's predecessor-entity paid a "success fee" to an entity controlled by Jensen as a condition for entering into a transaction.

4. In December 2023, Jensen and PrimaLend directed Eric Ryan ("**Ryan**") to take control of Prime Asset. Shortly afterwards, in April 2024, Jensen coerced Ryan into purchasing the overpriced ASF portfolio, thereby significantly impairing Prime Asset's financial stability and reducing its borrowing base by nearly $500,000 in one day.

5. On June 28, 2024, without notice or consent, PrimaLend and Jensen unilaterally raised the interest rate on Prime Asset's revolving line of credit from 7.0% to SOFR + 9.50% (equivalent at that point to 14.8%), resulting in over $2,000,000 in additional interest expenses from June 28, 2024 through the present.

6. In a meeting on January 13, 2025, Jensen admitted to PrimaLend's substantial control over Prime Asset despite lacking formal legal authority: (a) Jensen claimed that Ryan's equity interests in Prime Asset in fact belonged to PrimaLend and (b) Jensen described himself as a board member making decisions for Prime Asset. In response, Ryan expressed concerns about coercion and management removals for non-compliance with PrimaLend's directives.

7.      PrimaLend's excessive control and fraudulent transfers have acutely damaged (and continue to damage) Prime Asset's financial stability. Indeed, Prime Asset is currently threatened with foreclosure under the loans PrimaLend tortiously caused it to incur.

8.      Prime Asset now brings claims for the following: (a) fraudulent transfer for a series of 2022 transactions shuffling money away from Prime Asset and into PrimaLend's coffers; (b) tortious interference for the excessive control PrimaLend wielded over Prime Asset and PrimaLend's widespread abuse of that control; (c) breach of fiduciary duty; (d) breach of good faith; (e) a judgment declaring the Defendants' transactions purportedly entered into on Prime Asset's behalf void and of no effect; (f) a declaratory judgment recognizing Prime Asset's right to offset any debts owed to the Defendants based on any of the Defendants' tortuous conduct (notwithstanding PrimaLend's current attempt to sell all or substantially all of its assets free and clear of all claims and interests pursuant to 11 U.S.C. § 363); and (g) an order restraining the Defendants from foreclosing on, or seeking to foreclose on, those portions of Prime Asset's debt flowing from, and (potentially) offset by, the Defendants' tortious conduct.

**JURISDICTION AND VENUE**

9.      The United States Bankruptcy Court for the Northern District of Texas (the "**Court**") has jurisdiction over the parties and the subject matter of this proceeding pursuant to §§ 157 and 1334 of title 28 of the United States Code.

10.     Prime Asset confirms its consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure, to the entry of a final order by this Court if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**PARTIES**

12.        Plaintiff Prime Asset LLC is a Texas limited liability company with its principal place of business at 524 E Lamar Blvd Suite 100 Arlington, TX 76011.

13.        Upon information and belief, Defendant PCAP Holdings, LP is a Texas limited partnership with its principal place of business at 3460 Lotus Drive, Suite 100, Plano, TX 75075.

14.        Upon information and belief, Defendant PrimaLend Capital Partners, LP is a Texas limited partnership with its principal place of business at 3460 Lotus Drive Suite 100, Plano, TX 75075.

15.        Upon information and belief, Defendant Good Floor Loans LLC is a Texas limited liability company with its principal place of business at 3460 Lotus Drive Suite 100, Plano, TX 75075.

16.        Upon information and belief, Defendant LNCMJ Management, LLC is a Texas limited liability company with its principal place of business at 3460 Lotus Drive, Suite 100, Plano, TX 75075. LNCMJ is the managing entity and general partner of both PCAP and PCP.

17.        Upon information and belief, Defendant Mark Jensen, a natural person residing in the state of Texas, is the Chief Executive Officer and 50% owner of LNCMJ and is the indirect owner of approximately 18% of PCAP.

18.        On October 22, 2025 (the "**Petition Date**"), Defendants PCP, GFL, and LNCMJ filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court. On December 12, 2024, Defendant PCAP filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court (together with PCP, GFL, and LNCMJ's bankruptcy proceedings, the "**Chapter 11 Cases**").

19.        Prime Asset is a party in interest in the Chapter 11 Cases pursuant to 11 U.S.C. § 1109(b).

**FACTUAL BACKGROUND**

A.      **PrimaLend.**

20.          Under the direction of CEO Mark Jensen, PrimaLend operates one of the nation's largest lending operations targeted at BHPH dealerships. Under the BHPH model, auto dealers provide near-instant, point-of-sale financing (generally at high interest rates) to car purchasers who often do not qualify for a traditional bank loan.

21.          BHPH transactions are generally conducted through RISCs, which outline the financing terms for the purchase and authorize the dealership to repossess the sold vehicle promptly in the event of default.

22.          PrimaLend (through Defendant PCP) provides revolving lines of credit ("**RLOCs**") to its client dealerships for the purpose of originating (or purchasing) RISCs. Through Defendant GFL, PrimaLend also offers floorplan loans to assist client dealerships in acquiring vehicle inventory for sale.

23.          Given the credit-challenged nature of BHPH customers, BHPH transactions feature a heightened rate of default. To remain profitable, BHPH dealerships must, therefore, be able to rapidly repossess, repair, and resell the vehicles securing their loans. As such, BHPH loans require continuous, hands-on, and expert monitoring and servicing.

24.          PrimaLend has engaged in systemic aberrant lending practices, implementing a scheme that extends far beyond the wrongs committed against Prime Asset.

25.          During periods when the BHPH industry was prospering, PrimaLend consistently encouraged dealerships to expand their loan portfolios beyond their servicing capabilities, supported by freely issued debt that they could not repay. On information and belief, PrimaLend deliberately ignored financial metrics of these dealerships that could have warned both parties of the inevitable collapse that would ensue.

26.     PrimaLend's profligate lending inevitably pushed these dealerships into over-leveraged and over-advanced positions, where the value of their collections, repossessions, and inventory was far exceeded by their debts to PrimaLend. However, foreclosing on dealerships where PrimaLend had often invested millions or tens of millions of dollars would have risked compromising PrimaLend's reputation of financial success to the public, its lenders, and its clients.

27.     PrimaLend's consistently chosen path for navigating this dilemma was, time and time again, to simply push it off into the future—loaning money to *new* dealerships or operators to purchase the distressed RISC notes from its failing clients, regardless of that dealership's or operator's ability to actually pay down the newly acquired debt.

28.     As such, and to delay recognition of the inevitable losses stemming from its inappropriate lending practices, PrimaLend was in constant need of dealerships that it could persuade, induce, or pressure into purchasing distressed portfolios. These dealerships, in turn, would inevitably be left holding PrimaLend's bag of debt when the pyramid toppled.

29.     At the same time, PrimaLend artificially inflated the value of its dealership-clients to conceal PrimaLend's precarious financial position from its lenders. This included, but was not limited to, (a) purchasing minimal-value assets from clients for over-inflated prices so that the ensuing loss to PrimaLend could be amortized over the course of years instead of being reported to lenders at one time, (b) directing its clients to borrow from one of PrimaLend's credit lines to pay off other PrimaLend credit lines in order to carefully manage the data presented to PrimaLend's lenders regarding its clients' performance, (c) "rebating" a portion of the interest payments that PrimaLend received from its dealership-clients, which (i) artificially inflated those dealership-clients' top-line performances and borrowing bases (and, by extension, PrimaLend's own borrowing base with its lenders) but (ii) made little actual difference to those dealership-clients' financial fundamentals given their inability to repay the underlying debt, and (d) converting large quantities of dealership-client debt into subordinated debt to enable PrimaLend

to manipulate the amount of outstanding senior debt it needed to report to its lenders for the purpose of its lender covenants.

30. By means of these tactics, PrimaLend was able to direct millions of dollars in cash distributions to Jensen (filtered through PCAP, in which Jensen holds an indirect limited partnership interest), which PrimaLend's lenders would not have permitted if PrimaLend and Jensen had taken timely and appropriate losses on distressed portfolios.

**B.** **Prime Asset.**

31. Prime Asset operates in the BHPH auto-dealing space, where it performs, or has performed, a wide variety of roles. Currently, the central plank of Prime Asset's business model is its Strategic Dealer Solutions ("**SDS**") business line.

32. SDS provides much-needed liquidity to retail BHPH dealers in 31 states. In exchange for upfront funding, SDS purchases and services RISCs from its dealership-clients— often with the aim of reselling those RISCs in bulk once they have been adequately "seasoned." Seasoning a RISC portfolio involves holding and servicing that portfolio for a sufficient period of time to enable bulk-purchasers to reliably determine the risk profile of the underlying contracts.

33. SDS's factoring-based model enables it to extend financing to dealerships that are too small to enter into an RLOC with PrimaLend. Moreover, because SDS's model does not require it to originate its own RISCs, ownership of SDS would not place PrimaLend in direct competition with the retail BHPH lenders who form the bread and butter of PrimaLend's client base. SDS, therefore, has long been viewed and described by Jensen as an attractive acquisition target and he has made repeated overtures seeking to persuade SDS's management to part with their ownership of it.

34.     In addition to its factoring business, Prime Asset's considerable expertise in nationwide BHPH-loan servicing has enabled it to operate as the third-party servicer for multiple large BHPH dealerships that lack the means (or licenses) to service their own loans. In that capacity, and at PrimaLend's urging, Prime Asset acts as third-party servicer for large dealership-clients of PrimaLend.

35.     Prime Asset's servicing capabilities have grown in import to PrimaLend as, with the collapse of PrimaLend's BHPH-dealer client base, PrimaLend has been forced to take increased responsibility for the servicing of RISCs originated by PrimaLend's now-insolvent borrowers. As such, PrimaLend has grown increasingly committed to treating Prime Asset like a captive loan-servicer and, ultimately, in forcing Prime Asset's ownership to surrender their equity-interests in the company to PrimaLend.

36.     Prime Asset's financial operations are supported by both an RLOC and a subordinated loan from PrimaLend, which serves as Prime Asset's sole lender. On February 28, 2019, Prime Asset secured a $35,000,000 RLOC from PrimaLend (the "**RLOC Agreement**", Exhibit A). Later that year, on November 27, 2019, Prime Asset obtained an $11,000,000 term loan, subordinated to the RLOC (the "**Subdebt Agreement**", Exhibit B). On September 1, 2022, PrimaLend increased Prime Asset's RLOC to $50,000,000 (the "**RLOC Amendment**", Exhibit C) and its Subdebt to $14,000,000 (the "**Subdebt Amendment**", Exhibit D).

37.     At all relevant times, Jensen has been fully aware of, and taken full advantage of, the pervasive extent of his control over Prime Asset. Indeed, during a January 2025 conversation with Ryan, Jensen sought to convince Ryan to surrender his equity stake in Prime Asset, and Jensen emphasized that very control. While acknowledging that PrimaLend lacked *de jure* authority over Prime Asset's decision making, Jensen asserted that PrimaLend's "economic" control over Prime Asset gave PrimaLend a *de facto* equity stake in Prime Asset. Moreover, Jensen asserted that Ryan's equity was effectively held in trust for PrimaLend and that Jensen himself

9

was akin to a *de facto* board member or company chairman. Jensen argued that Ryan was not losing anything by allowing PrimaLend to acquire Prime Asset's equity because Ryan's ownership was never truly his to begin with. Rather, PrimaLend allowed Ryan to maintain ownership of Prime Asset as an incentive to perform as CEO, when in reality PrimaLend effectively owned Prime Asset.

**C.      2022 – PrimaLend Turns Prime Asset into a Dumping Ground for Distressed Assets.**

38.      At all times relevant to this suit prior to November 3, 2023, Prime Asset's managing member was Alan Keate ("**Keate**").

39.      When Prime Asset's financial condition deteriorated in late 2020, Jensen permitted Keate to avoid default by providing an approximately $700,000 equity infusion. On information and belief, this infusion actually came from Jensen himself—and was later repaid by Keate out of Prime Asset's accounts.

40.      Indeed, Prime Asset's records reflect that, on October 13, 2022, Keate requested (and received) a draw on Prime Asset's commercial line of credit from PrimaLend to pay $617,916.44 to an entity named Little Denmark (the "**October 2022 Transfer**"), which, on information and belief, is run by Jensen for the purpose of making personal and short-term loans. This draw had no justification under the RLOC Agreement and was outside of the course of Prime Asset's ordinary business; however, Jensen approved the transaction to ensure his personal repayment.

41.      At the time of the October 2022 Transfer, Prime Asset was over-advanced and over-leveraged. It was also financially insolvent (and was certainly was rendered insolvent upon completion of the October 2022 Transfer). Given the extensive information Prime Asset reported to PrimaLend, PrimaLend (and Jensen) was well-aware that Prime Asset's liabilities at this time exceeded its assets. Moreover, there existed a live possibility that Jensen's loan would not be repaid in the then-plausible event of foreclosure. As such, Jensen's extraordinary

10

authorization for Keate to repay Jensen's loan using PrimaLend's RLOC served the direct purpose of protecting Jensen's personal loan from impairment by other creditors.

42.     In early September of 2022, Jensen needed to sell assets from AFCH, a failing Tennessee Dealership with approximately $17,200,000 in outstanding unpaid loans. On or about September 2, 2022, Jensen approached Keate about leveraging Prime Asset's overextension to PrimaLend's advantage. He successfully pressured Keate into causing Prime Asset to purchase the AFCH portfolio based on due diligence conducted over a single weekend.

43.     Moreover, while Prime Asset's internal valuations of the AFCH portfolio reflected a likely recovery value of 56.5% of the purchase price, PrimaLend pressured Keate into approving a transaction at the significantly higher rate of 72.9% to enable PrimaLend to minimize any loss it might need to recognize. In exchange PrimaLend offered certain minor concessions towards Prime Asset's pre-existing debt, such as a 7% fixed interest rate via a loan amendment.

44.     Within two months of entering the transaction, Prime Asset's over-advance had deteriorated significantly: **from $913,421 on August 31, 2022 to $7,736,520 on November 2, 2022**. After one year, approximately $9,500,000 of the AFCH assets had been written-off as uncollectable, the recovery rate stood at a mere 13.9%, and the remaining (non-written-off) unpaid principal balance had shrunk to approximately $4,800,000. The total Collateral Recovery Rate for the assets, meanwhile, stood at a mere 34%, well below the 72.9% at which Jensen pressured Prime Asset into the sale. Upon information and belief, Jensen was always aware of the portfolio's underperformance and merely wanted to offload the assets by manipulating Keate into purchasing the assets far above their true value.

**D.     2023 – PrimaLend Forces Keate Out of Prime Asset and Assumes _De Facto_ Control.**

45.     PrimaLend's planned dumping of the AFCH portfolio onto Prime Asset rendered Prime Asset financially over-leveraged and over-advanced. By September 2023, Jensen decided to cut ties with Keate and agreed that Adonis Auto Group ("**Adonis**") would take over as

the managers of Prime Asset.

46.     Although the transaction agreement removing Keate would not be executed until November 3, 2023, Jensen—acting on behalf of PrimaLend—took over the functional operation of Prime Asset while the transaction remained pending.

47.     Acting as *de facto* CEO, Jensen caused Prime Asset to transfer nearly $38,000,000 in assets to AOA.

48.     Jensen likewise caused AOA to purchase the entire portfolio of YCS with the intention of later transferring those same assets back into Prime Asset. This portfolio had a total unpaid principal balance of approximately $4,100,000 and along with approximately $3,000,000 in accompanying debt to PrimaLend.

49.     PrimaLend, despite not owning any equity interests in Prime Asset at this point in time, directed Prime Asset to engage in these transactions. As a result, Prime Asset lost control over its assets (which were managed by Adonis under PrimaLend's direction), and PrimaLend was permitted to determine which proceeds from the servicing of AOA's accounts should be allocated to the RISCs previously owned by Prime Asset while they remained on AOA's books.

**E.     April 2024 – PrimaLend Pressures Prime Asset's New Management to Take on Yet Another Distressed Portfolio.**

50.     On November 3, 2023, Texas Mega FyF Holdings, LLC, a wholly owned entity of Matthew Burton (the then-CEO of Adonis), acquired full ownership of Prime Asset. On December 31, 2023, Ryan acquired full ownership of Texas Mega FyF Holdings, LLC.

51.     In 2024, PrimaLend intensified its efforts to force Prime Asset to acquire underperforming assets for PrimaLend's benefit.

52.        In early April 2024, Jensen pressured Ryan, over the course of repeated phone conversations, into purchasing the distressed receivables portfolio of ASF (yet another distressed PrimaLend borrower) at 77.5% of the then-outstanding principal balance. As in all transfers orchestrated by PrimaLend, this 77.5% ratio was the precise amount necessary for PrimaLend to avoid recognizing a loss, thereby affording PrimaLend to hide its poor performance from its lenders, and bore no relationship to the (significantly lower) underlying value of the portfolio.  Despite Jensen's claim that entering into this transaction would result in a net positive move in Prime Asset's borrowing base with PrimaLend, the ASF transaction actually degraded that borrowing base by almost $500,000 in a single day.

F.        **June 2024 – PrimaLend Repeatedly Acts on Prime Asset's Behalf Without Actual or Apparent Authority or Authorization.**

53.        On June 26, 2024, Jensen decided to make changes at Prime Asset without any corporate authority or official documentation to do so. All of the tranches of debt that were sold to AOA in October of 2023 were 'sold' back into Prime Asset *without a single member of Prime Asset authorizing the proposed purchase*. Although the parties had extra-contractual (and non-binding) understandings that the transferred debt would not remain in AOA permanently, upon information and belief this was part of a plan under which *Adonis* (not Prime Asset) would repurchase the debt at issue through the use of a special-purpose entity. Jensen certainly had no authority to unilaterally effect a buy-back to *Prime Asset* without Prime Asset's authorization.

54.        The net effect of this *ultra vires*, purported transaction was the transfer of approximately $18,000,000 of new assets and over $35,000,000 of new debt to Prime Asset's balance sheet. While Prime Asset faithfully and capably serviced this debt, the monthly inflows never exceeded $1,200,000 and were—by their very nature—far insufficient to amortize the principal balance of a debt-load twice the size of the incoming assets, or to do anything more than keep up with the interest payments that PrimaLend had foisted upon Prime Asset.

55.      Next, on June 28, 2024, Jensen decided to move $24,000,000 of Senior Debt at Prime Asset to Subdebt and to raise the interest rate on Prime Asset's RLOC to SOFR + 9.50% from a 7% fixed interest rate. At the same time, PrimaLend changed Prime Asset's advance rate from 98% of the purchase price of unpaid principal balance to a 75% fixed structure bearing no relationship to Prime Asset's business model or financial performance. Prime Asset did not agree to these changes and no formal documentation memorialized them.

56.      In sum, PrimaLend, under the direction of Jensen, has repeatedly used Prime Asset to facilitate fraudulent transfers and to serve as a repository for failing dealership and finance company loans.

### G.      2025 – PrimaLend Seeks to Foreclose on the Debt it Foisted on Prime Asset.

57.      Prime Asset's RLOC Agreement and Subdebt Agreement both matured on December 31, 2024. PrimaLend unsuccessfully demanded an 85% ownership of Prime Asset as the price of a possible extension.

58.      In August 2025, Ryan refused to sign a Pledge Agreement that PrimaLend demanded, which would have resulted in PrimaLend becoming the 100% owner of Prime Asset in the event the Pledge Agreement was triggered.

59.      On November 13, 2025, Prime Asset received from PrimaLend a notice of default and demand for immediate payment of the over-advance.

60.      On December 9, 2025, PrimaLend notified Prime Asset via email that, pursuant to the notice of default, PrimaLend was requesting that Prime Asset assemble all collateral under the RLOC Agreement and Subdebt Agreement and either make it available for pickup by PCP or send it directly to PrimaLend's office in Plano, Texas, by December 12, 2025.

61.      That same day, PrimaLend also gave notice that it intends to seek the appointment of a receiver to, by and through itself and/or its contractors, manage the collections, servicing, and/or disposition of collateral constituting materially all of Prime Asset's assets.

14

62.     That same day, PrimaLend requested that Prime Asset provide copies of all licenses held across every jurisdiction in which Prime Asset d/b/a SDS operates, holds/owns collateral, and/or maintains such licenses.

63.     Although the economic fundamentals of Prime Asset's business remain strong, PrimaLend's unlawful transfers, tortious interference, and other unlawful acts have saddled it with almost $45,000,000 of debt to PrimaLend. Over $28,500,000 of that debt is the result of PrimaLend's *ultra vires* efforts to transfer the AOA assets to Prime Asset, including $21,500,000 of debt affected by PrimaLend's unilateral reclassification of Prime Asset's senior debt as subordinated debt.

64.     This has left Prime Asset in financial distress and at imminent risk of foreclosure (and possibly even bankruptcy).

**CAUSES OF ACTION**

**COUNT ONE**
**(AFCH Fraudulent Transfer – All Defendants)**

65.     Prime Asset incorporates all previous and subsequent allegations as though fully stated herein.

66.     On or about September 1, 2022, Keate agreed to PrimaLend's demand that he cause Prime Asset to purchase the AFCH portfolio. Although Prime Asset's own valuation of that portfolio revealed that it was unlikely to yield more than 56.5 cents on the dollar, Prime Asset agreed to the purchase under pressure from Jensen in exchange for minor concessions on its pre-existing debt.

67.     Prime Asset's inflated payments to AFCH were used to pay off AFCH's then-existing debts to PCP.

68.     At the time of this transaction, both Keate and PrimaLend knew (and at a minimum should have known) that Prime Asset was over-leveraged, over-advanced, and legally

15

insolvent (and, at a minimum, that it would become insolvent upon the closing of the transaction), with the value of Prime Asset's assets exceeded by the value of its liabilities.

69.        Prime Asset did not receive reasonably equivalent compensation for the obligations that Keate caused Prime Asset to incur under the AFCH transaction. Indeed, given the AFCH portfolio's almost-immediate, readily predictable collapse, it hardly received compensation at all.

70.        Prime Asset's purchase of the AFCH portfolio constituted a fraudulent transfer under Tex. Bus. & Com. Code § 24.006(a).

71.        In receiving the fraudulently transferred assets, PCP knew (and at a minimum should have known) all facts necessary to recognize the voidable nature of the AFCH transfer.

72.        In receiving the fraudulently transferred assets, PCP was an other-than-good faith purchaser for the purpose of Tex. Bus. & Com. Code § 24.009(b)(2).

73.        PCAP's subsequent receipt of the fraudulently transferred assets from PCP in its capacity as corporate parent, and Jensen's subsequent receipt of those assets from PCAP in his capacity as limited partner, were both other-than-good-faith purchases.

74.        To the extent that PCP transferred Prime Asset's funds to any other PrimaLend entity, or to Jensen personally through any other means, the transferee in those transactions were likewise other-than-good-faith purchasers.

75.        Prime Asset has standing to assert a fraudulent transfer claim based on assets transferred by a former principal. *See United States v. Janvey*, 767 F.3d 430, 437 (5th Cir. 2014).

76.        Wherefore, Prime Asset respectfully requests entry of an order voiding the September 2022 AFCH transfer and ordering PrimaLend to disgorge all proceeds received therefrom to the maximum extent permissible by law.

## COUNT TWO
### (October 2022 Fraudulent Transfer – Jensen)

77.     Prime Asset incorporates all previous and subsequent allegations as though fully stated herein.

78.     On or about October 13, 2022, Defendant Jensen personally arranged for Alan Keate to transfer $617,916.44 of Prime Asset's funds to an entity that Jensen wholly owned.

79.     On information and belief, the funds from this transaction (*i.e.*, the October 2022 Transfer) were later transferred to Jensen.

80.     At the time of the October 2022 Transfer, Prime Asset was over-leveraged and over-advanced. It was also financially insolvent (or, at the very least, was rendered insolvent by the transaction), with the value of Prime Asset's assets exceeded by the value of its liabilities. Moreover, Jensen, as an insider actively involved in monitoring and facilitating Prime Asset's business, was well-aware of these facts.

81.     Jensen was likewise aware that the October 2022 Transfer was not made in the ordinary course of Prime Asset's business and was not permitted under the relevant RLOC Agreement.

82.     Nevertheless, Jensen approved a draw on Prime Asset's RLOC to fund the proposed transaction to ensure that his personal loan to Prime Asset was repaid.

83.     The October 2022 Transfer constituted a fraudulent transaction to an insider voidable under Tex. Bus. & Com. Code § 25.006(a) and/or § 25.006(b).

84.     In receiving the fraudulently transferred assets from Little Denmark, Jensen knew (and at a minimum should have known) of all facts necessary to recognize the voidable nature of the October 2022 Transfer.

85.     In receiving the fraudulently transferred assets from Little Denmark, Jensen was an other-than-good faith purchaser for the purpose of Tex. Bus. & Com. Code § 24.009(b)(2).

86.     Prime Asset has standing to assert a fraudulent transfer claim based on assets transferred by a former principal. *See Janvey*, 767 F.3d at 437.

87.     Wherefore, Prime Asset respectfully requests entry of an order voiding the October 2022 Transfer and ordering Jensen to disgorge all proceeds received therefrom to the maximum extent permissible by law.

### COUNT THREE
### (Excessive Control/Tortious Interference – PCP, LNCMJ and Jensen)

88.     Prime Asset incorporates all previous and subsequent allegations as though fully stated herein.

89.     Throughout its relationship with Prime Asset, PrimaLend, acting through Jensen, has exerted pervasive and sustained control over all aspects of Prime Asset's business.

90.     Indeed, Jensen himself acknowledged such control, noting that (a) he is for all practical purposes a chairman or board member of Prime Asset and (b) PrimaLend's ability to foreclose on Prime Asset's loans grants PrimaLend a *de facto* majority equity stake in Prime Asset. Jensen had gone so far as to argue that Ryan's equity stake in Prime Asset is in fact held in *de facto* trust for the benefit of PrimaLend.

91.     While the powers of a lender with the right to call default are expansive under Texas law, they are far from limitless. As this Court has recognized as recently as 2021, even where a lender has the right to contractual remedies, that lender may nevertheless be held liable for tortious interference where it uses the *threat* of imposing those remedies to "grossly interfere with the Debtor's business by injecting itself into corporate governance, where there [is] no contractual right" to do so under the relevant loan agreement. *In re Bailey Tool & Manufacturing Co.*, 2021 WL 6101847 at *48 (N.D. Tex. Bankr. Dec. 23, 2021). Likewise, for over 40 years, courts have recognized that lenders do not possess unfettered authority to interfere with their borrowers' rights to "to have [their] affairs managed by competent directors and officers

18

who would maintain a high degree of undivided loyalty to the company." *State Nat. Bank of El Paso v. Farah Mfg. Co.*, 678 S.W.2d 661, 690 (Tex. App. 1984).

92.     Here, PrimaLend has, at its discretion, used its lending position to replace Prime Asset's corporate leadership twice within the past 25 months.

93.     Moreover, PrimaLend's interference has extended far beyond the staffing-level. Time and time again, including with the AFCH, YCS, and ASF portfolios, PrimaLend leveraged its power to declare defaults, thereby pressuring Prime Asset into absorbing junk portfolios to advance PrimaLend's broader corporate interests that are unrelated to Prime Asset.

94.     Absent PrimaLend's interference, Prime Asset would have avoided these acquisitions and the consequential financial harm.

95.     PrimaLend exploited its *de facto* CEO role in Prime Asset during the period when Keate was being ousted from Prime Asset and facilitated the transfer of substantial tranches of Prime Asset receivables to AOA, thereby depriving Prime Asset of control over those receivables.

96.     Jensen unilaterally asserted the authority to reclassify Prime Asset's senior debt as subordinated debt and to reset Prime Asset's contractual advance rate to 75% (*i.e.*, an amount bearing no correlation to Prime Asset's financial profitability or business model and with no input or approval from Prime Asset).

97.     Most egregiously, PrimaLend purported to use its control over Prime Asset to enter into major and consequential transactions with no approval on Prime Asset's part whatsoever—including the alleged 2024 buyback of approximately $18,000,000 in assets impaired by over $35,000,000 in debt.

98.     PrimaLend's interference has materially damaged Prime Asset by destabilizing its financial standing and increasing its debt. Perversely, by forcing Prime Asset to

19

incur more debt, PrimaLend's interference has further strengthened its control over Prime Asset going forward.

99.     In short, PrimaLend has committed tortious interference by "grossly interfer[ing] with the Debtor's business by injecting itself into corporate governance, where there was no contractual right" to do so under any relevant contractual or statutory provision. *See Bailey*, 2021 WL 6101847, at *48.

100.     PrimaLend's actions have harmed Prime Asset in an amount to be determined at trial.

101.     Wherefore, Prime Asset respectfully requests entry of an order awarding compensatory and exemplary damages in an amount to be determined at trial.

## COUNT FOUR
### (Breach of Fiduciary Duty – PCP, LNCMJ and Jensen)

102.     Prime Asset incorporates all previous and subsequent allegations as though fully stated herein.

103.     PrimaLend and Jensen have exerted excessive control over Prime Asset's management and decision-making process. Abusing their position as Prime Asset's sole lender and their *de facto* influence flowing from Prime Asset's over-advance, PrimaLend directed Prime Asset to enter self-harming transactions and made unilateral decisions regarding the structuring of its senior and subordinated debt.

104.     PrimaLend played an active role in Prime Asset's executive management by removing Alan Keate from his role as CEO and sole owner. In October 2023, Jensen assumed *de facto* control without any equity ownership or formal management position. Under Jensen's direction, Prime Asset transferred assets to AOA and then purported to repurchase those assets, both without any authorization or approval by Prime Asset. In December 2023, after installing Ryan as the new leader, PrimaLend and Jensen continued to exert substantial control over Prime

Asset by directing it to purchase overvalued portfolios to benefit PrimaLend.

105.    During a recorded meeting on January 13, 2025, Jensen, while acknowledging the lack of *de jure* right, stated that he was a *de facto* chairman or board member of Prime Asset, thereby entitling him to make decisions concerning the fate of Prime Asset. By Jensen's own admission, PrimaLend behaved as though it fully owned Prime Asset and that Ryan's equity in Prime Asset belonged to PrimaLend.

106.    Given PrimaLend's extensive involvement in Prime Asset's operations, it exercised substantial and excessive control over Prime Asset. As a result of that control, PrimaLend and Jensen owed fiduciary duties to Prime Asset, including the duties of care, loyalty, and fairness.

107.    PrimaLend breached these fiduciary duties by allowing Jensen to make unauthorized strategic decisions on behalf of Prime Asset. These actions included directing Adonis to manage portfolios and channel proceeds through a special purpose vehicle to PrimaLend, transferring assets to AOA, restructuring Prime Asset's debt, and unilaterally raising interest rates on the RLOC without Prime Asset's consent.

108.    Moreover, PrimaLend breached its fiduciary duties by instructing Prime Asset to acquire the AFCH portfolio in September 2022, the ASF portfolio in April 2024, and the AOA assets in June of 2024 despite knowing that each of these portfolios was overvalued and underperforming.

109.    PrimaLend's actions harmed Prime Asset in an amount to be determined at trial.

110.    Wherefore, Prime Asset respectfully requests entry of an order awarding compensatory and exemplary damages in an amount to be determined at trial.

## COUNT FIVE
### (Breach of the Covenant of Good Faith and Fair Dealing – PCP, LNCMJ and Jensen)

111. Prime Asset incorporates all previous and subsequent allegations as though fully stated herein.

112. PrimaLend and Jensen's excessive control over Prime Asset created a fiduciary relationship that obligated them to act in good faith in dealing with Prime Asset.

113. During the January 13, 2025 meeting, Jensen admitted that he acted in the role of a chairman or board member of Prime Asset, while PrimaLend acted as if it owned all of Prime Asset's equity interests.

114. PrimaLend and Jensen unfairly interfered with Prime Asset's rights under the RLOC and Subdebt Agreements by exercising undue control and directing actions that were against Prime Asset's interests. This interference prevented Prime Asset from using its line of credit for its own benefit, diverted funds to serve PrimaLend's interests at the expense of Prime Asset's financial position, and increased Prime Asset's debt owed to PrimaLend.

115. PrimaLend and Jensen breached their obligations to act in good faith through several actions, including the following:

116. In September 2022, Jensen misled Prime Asset's representative, Alan Keate, into purchasing the AFCH portfolio for $17,200,000 by offering a 7% fixed interest rate on a loan amendment. Despite Prime Asset valuing the AFCH portfolio at only 56.5% of the Unpaid Principal Balance, Prime Asset was pressured to pay significantly more. Subsequently, the portfolio's value quickly declined and exacerbated Prime Asset's financial difficulties and complicated repayment to PrimaLend.

117.    In October 2023, Jensen assumed decision-making control of Prime Asset and implemented strategies to manage financial losses for PrimaLend. This included having Adonis manage Prime Asset's portfolio and funneling proceeds to PrimaLend, thereby resulting in loss of asset control and revenue, increased debt, unilateral changes to interest rates, and debt restructuring.

118.    In April 2024, Jensen compelled Ryan to purchase the overpriced ASF portfolio as a favor to PrimaLend, despite knowing that the assets were underperforming. This purchase significantly harmed Prime Asset's financial stability and reduced its borrowing base by nearly $500,000 in a single day.

119.    On June 28, 2024, PrimaLend and Jensen unilaterally increased the interest rate on Prime Asset's RLOC without notice or consent. The interest rate was changed from 7% to SOFR + 9.50% and resulted in over $2,000,000 in additional interest expenses from June 28, 2024 through the present.

120.    PrimaLend and Jensen's actions obstructed Prime Asset from benefiting from the RLOC and Subdebt Agreements. Prime Asset entered into these agreements to secure capital for business growth; however, PrimaLend and Jensen's excessive control coerced Prime Asset into detrimental transactions instead. Furthermore, PrimaLend and Jensen acted in bad faith by unilaterally restructuring Prime Asset's senior and subordinate debt and leaving Prime Asset significantly over-leveraged.

121.    PrimaLend and Jensen's actions have harmed Prime Asset in an amount to be determined at trial.

122.    Wherefore, Prime Asset requests entry of an order awarding compensatory and exemplary damages in an amount to be determined at trial.

## COUNT SIX
### (Declaratory Judgement – All Defendants)

123.    Prime Asset incorporates all preceding and subsequent allegations as if fully set forth herein.

124.    On June 26, 2024, without authority or proper documentation, Jensen unilaterally  (despite having no equity or management interest in Prime Asset) caused Prime Asset to purchase from AOA approximately $18,000,000 in assets that were subject to over $35,000,000 in debt.

125.    Jensen's unilateral action to transfer these debt tranches to Prime Asset without its consent renders the repurchase invalid.

126.    Wherefore, Prime Asset respectfully requests a declaratory judgment that the repurchase of these tranches of debt from AOA is invalid and unenforceable.

## COUNT SEVEN
### (Declaratory Judgment – All Defendants)

127.    Prime Asset incorporates all preceding and subsequent allegations as if fully set forth herein.

128.    PrimaLend has asserted that Prime Asset is indebted to it under the RLOC and Subdebt Agreements, and that this debt extends to the full face value of those agreements.

129.    Pursuant to Texas law, Prime Asset is entitled to offset the debts it owes to PrimaLend, if any, by the amount PrimaLend owes Prime Asset, including for claims of fraudulent transfer, tortious interference, breach of fiduciary duty, and bad faith.

130.    Pursuant to 11 U.S.C. § 553(a), and barring exceptions not applicable here, nothing in the Bankruptcy Code "affect[s] any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case."

131.     Wherefore, Prime Asset respectfully requests a declaratory judgment that its debts to the Defendants, if any, are subject to offset under 11 U.S.C. §  553(a) up to the full values of Prime Asset's claims as determined at trial.

## COUNT EIGHT
### (Order Restraining Foreclosure – All Defendants)

132.     In reliance on Prime Asset's alleged default under the RLOC Agreement, PrimaLend has taken multiple steps towards foreclosing on Prime Asset's assets—including its demand that Prime Asset surrender all collateral and consent to the appointment of a receiver.

133.     The Defendants' allegations of default, however, do not account for Prime Asset's aforementioned claims, and all amounts allegedly owed by Prime Asset must first be set off by Prime Asset's recovery on account of those claims.

134.     Pursuant to Tex. Bus. & Com. Code § 9.625, this Court may "order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions" wherever the proposed disposition would not comply with the Uniform Commercial Code (as enacted in Tex. Bus. & Com. Code § 9). Such compliance includes, of course, the existence of a valid default prior to any foreclosure.

135.     Wherefore, Prime Asset respectfully requests an order, pursuant to Tex. Bus. & Com. Code § 9.625, restraining the Defendants from foreclosing on Prime Asset's property except to the extent that, following liquidation and setoff of Prime Asset's claims, Prime Asset retains net-liability towards the Defendants.

WHEREFORE, for the forgoing reasons, Prime Asset respectfully requests that this Court enter judgment against the Defendants:

a)   Voiding the September 2022 and October 2022 fraudulent transfers and ordering disgorgement of all funds improperly received by PrimaLend as a result of those transactions;

b)   Granting damages in an amount to be determined at trial, but not less than $45,000,000.

c)   Declaring that the AOA Transaction was void, that the transferred assets remain the property of AOA, and that all debts purportedly owed by Prime Asset to the Defendants resulting from the AOA transaction are null and void;

d)   Setting off all obligations owed by Prime Asset to any of the Defendants by the damages recovered by Prime Asset;

e)   Permanently enjoining the Defendants from collecting or seeking to collect on Prime Asset's collateral on the basis of the offset debt;

f)   Restraining the Defendants from foreclosing on Prime Asset's property under Tex. Bus. & Com. Code § 9.625;

g)   Awarding pre- and post-judgment interest;

h)   Awarding reasonable attorneys' fees; and

i)   Granting such other and further relief as this Court deems just and equitable.

Dated: January 7, 2026

/s/

**MCDERMOTT WILL & SCHULTE LLP**
Marcus A. Helt (TX Bar No. 24052187)
Charles R. Gibbs (TX Bar No. 7846300)
2801 North Harwood Street
Suite 2600
Dallas, Texas 75201
Telephone: (214) 295-8000
E-mail: mhelt@mwe.com
        crgibbs@mwe.com


-and-

Julia Beskin (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2218
Email: julia.beskin@srz.com

-and-

Steven Szanzer (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York, 10017
Telephone: (212) 547-5887
Email: sszanzer@mwe.com

*Attorneys for Prime Asset LLC, Plaintiff*